RECEIPT # 34806
AMOUNT 150.00
YES
LOCAL RULE 4.1
WAIVER OF SERV.
OCT 31
DATE 10/31/01

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GEORGE MURPHY, individually and on behalf of all others similarly situated, Plaintiff, | Case No. |
| v. | CLASS ACTION |
| ART TECHNOLOGY GROUP, INC., JEET SINGH and JOSEPH T. CHUNG, | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES EXCHANGE ACT OF 1934 |
| Defendants. | Demand of a jury trial |

01-11869NG

Plaintiff, by his attorneys, brings this action on behalf of himself and all others similarly situated, and alleges the following upon personal knowledge as to himself and his own activities, and based on investigation conducted by counsel for all other matters. That investigation has included the thorough review and analysis of public documents, SEC filings, press releases and news articles concerning Art Technology Group, Inc. ("ATG" or "the Company") and certain officers and directors of the Company. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of all purchasers of the securities of ATG between January 25, 2001 and April 2, 2001, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include: ATG and its co-founders, Chief Executive Officer Jeet Singh and Chairman of the Board Joseph Chung.

2. ATG is a provider of customer management and e-commerce products and services. ATG offers an integrated suite of Java application server-based products, as well as related application development, integration, and support services.

1

DOCKETED

3. On January 25, 2001 Defendant Jeet Singh announced in a Company issued press release that, "ATG capped an extraordinary and profitable calender year 2000 with a record- breaking quarter that was strong across all metrics." Singh also raised revenue expectations for 2001 claiming that, "the combination of highly competitive product offerings, excellent market positioning, and broad customer base leaves us very well positioned for the coming year. As a result, we are raising our revenue expectations for 2001."

4. Only two months later, on April 2, 2001, Defendants announced that ATG's earnings for the quarter ending March 30, 2001 would be significantly below expectations. The Company said that it would post a loss of between 19 cents and 22 cents per share for the first quarter of 2001 ending March 31, instead of a profit of 9 cents per share which it had indicated earlier. The Company also said that revenues for the quarter would be in the range of $40 million to $42 million, instead of the previously touted $69 million.

5. The disclosure shocked the market, causing ATG's stock to plummet to $5.33 per share, on record volume of more than 24,867,600 shares, causing millions of dollars of damage to Plaintiff and the Class. ATG had fallen over 50% from its prior day close of $12.00, and over 85% from its Class Period high of over $42 per share.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa).

7. This action arises under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8. Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. 1391(b) because the acts charged herein, including the dissemination of materially false and misleading information, occurred in this district.

9. ATG maintains its executive office at 25 First Street, Cambridge, MA 02141.

10. In connection with the conduct complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

11. Plaintiff, George Murphy, purchased shares of ATG on January 31, 2001, and has suffered damages as a result of the wrongful conduct of Defendants alleged herein.

12. Defendant ATG is a leading provider of online customer relationship management and electronic commerce software and services. ATG offers an integrated suite of Java application server-based products, as well as related application development, integration, and support services. The ATG Dynamo e-Business Platform enables Global 2000 enterprises, as well as new businesses using the Internet as their primary business channel, to understand, manage, and build their online customer relationships and to more effectively market, sell, and support their products and services over the Internet.

13. Defendant Jeet Singh ("Singh") is, and at all relevant times was, Chief Executive Officer, board member and a founder of the Company. He ran ATG as a "hands-on" manager, dealing with

important issues facing ATG's business and its customer base including the Company's ability to achieve growth in fiscal 2001 in light of the dramatic adverse developments which had been affecting ATG's core and Internet customers. During the Class Period, Singh took advantage of inside information and sold over 140,000 shares of ATG for illegal gains of over $4.3 million.

14. Defendant Joseph T. Chung ("Chung") co-founded the Company with Singh in 1991 and is, and was at all relevant times, ATG's Chief Technology Officer, Treasurer and Chairman of the Board. During the Class Period, Singh took advantage of inside information and sold over 140,000 shares of ATG for illegal gains of over $4.3 million.

15. As officers, directors and/or controlling persons of a Company whose common stock is traded on NASDAQ and governed by the provisions of the federal securities laws, Singh and Chung had a duty to disseminate truthful information promptly and accurately with respect to the Company's operations, products, markets, management, earnings and business prospects, to correct any previously issued statements that had become materially misleading or untrue, and to disclose any trends that would materially affect earnings and the financial results of ATG, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

16. Under rules and regulations promulgated by the SEC under the Exchange Act, Singh and Chung also had a duty to report all trends, demands or uncertainties that were likely to influence: (a) ATG's liquidity; (b) ATG's net sales, revenues and/or income; and (c) previously reported financial information such that it would not be indicative of operating results. ATG's,

Singh's and Chung's representations during the Class Period violated these specific requirements and obligations.

17. Singh and Chung, because of their positions with the Company, controlled and/or possessed the power and authority to control the contents of ATG's reports, press releases and presentations to the public, which information was conveyed to the investing public. Singh and Chung were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

18. Singh and Chung are also liable as individual participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit upon the class. Because of their managerial and directorial positions with the Company, Singh and Chung had access to the adverse, non-public information about the business, finances and future business prospects of ATG as particularized herein and acted to misrepresent, misstate or conceal such information from plaintiff and the investing public.

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons who bought or otherwise acquired ATG common stock during the Class Period (or their successors in interest) and who suffered damages thereby ("the Class"). Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer,

director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest or assigns of any such excluded party.

15. The Class is so numerous that joinder of all members is impracticable. During the class period there were millions of ART common stock being traded publically; and the exact number of members of the Class is not known at this time, but is believed to number in the thousands.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interests which are contrary or in conflict with the interests of the Class members that they seek to represent. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

17. Plaintiff's claims are typical of the members of the Class, because Plaintiff and all of the Class members sustained damages arising from the same wrongful conduct complained of herein.

18. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19. Questions of law and fact common to the members of the Class predominate over

any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether the Defendants omitted and/or misrepresented material facts about ATG's business operations;

c) whether Defendants participated in and pursued the common course of conduct complained of herein;

d) whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

e) whether the members of the Class have sustained damages as a result of Defendants' conduct, and the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

22. Despite the dismal economic environment, on January 25, 2001, ATG announced "record financial results for the fourth quarter and for calender year 2000." Defendant Singh stated that, "ATG capped an extraordinary and profitable calender year 2000 with a record-breaking quarter that was strong across all metrics[.] The increase in new customer wins to a record number of 131 this quarter, including brands such as Ford Motor Company, Pfizer, and Reuters America, was complemented by excellent repeat business with our growing base of large enterprise customers such as Philips International, Procter & Gamble, and Sun Microsystems."

23. Concerning the current woes suffered by competitors, Singh said, "in particular, our attraction

among large enterprise customers in the Global 2000, and the rapid acceptance of our newest product offering, ATG Dynamo 5, in this market were very encouraging." "This past year was one of great accomplishment for ATG," continued Singh. "The company furthered its technological lead, aggressively expanded its customer and partner lists, and built out its infrastructure globally. These accomplishments, coupled with our focus on the bottom line, generated the company's first profit in the second quarter and increased earnings through the remainder of the year, resulting in a profitable calender year [the Company's first]. Perhaps even more significantly, we have seen our market presence worldwide grow tremendously over the last year, resulting in increased customer 'pull' for our products. We believe the combination of highly competitive product offerings, excellent market positioning, and broad customer base leaves us very well positioned for the coming year. As a result, we are raising our revenue expectations for 2001." The Company also stated that, "Partner enabled and channel sales accounted for 85% of the company's revenues during the fourth quarter."

24. On January 25, 2001 ART's CEO Jeet Singh conducted a radio interview hosted by the On24 Network. In the course of the interview Singh reassured investors that: (a) the sector in which ART sells its products remained "very healthy" despite the poor performance of ART's competitors; (b) prospects for future growth of ART remained strong; (c) ART was very different from BEA, IBM, Vignette and BroadVision and was not affected by the same forces operating against these companies; (c) ART was very responsive to market conditions, capable of "mov[ing] our budgets very very quickly as we understand what the market is doing;" and (d) "There is a lot of interest in our software" and as a result, we plan to grow the number of our employees by 100% and "our targeted revenue growth is 100% as well."

Question: Earnings beat street estimates for quarter and the year. What were the major factors playing into that performance?

Singh: We've had very strong growth in terms of market presence world wide. We had more customers in the last quarter, Q4, than we have ever had in our history -- 131 new customers

most of them large enterprise customers Pfizer, Ford Motor Company, Reuters America, American Airlines, Lloyds of London. . . . A very broad range of new customers and new customer wins. Also [we] have seen a lot of repeat business from our existing customers, which we normally see and that's growing as well.

Question: Your main competitor BroadVision reported earnings that weren't as strong as the market expected. What would you tell investors at this point? Remain bullish on Art Technology Group?

Singh: We are obviously feeling good about the prospects for our sector in terms of demand. Clearly there are competitors of ours who may have had slowing of growth but there are quite a few factors to consider. I think there have been some trends of how people buy software in our space. There has been a trend towards java infrastructure which has been very good for us. There have been trends towards modular systems that do more customer management commerce and personalization. Those have also been in our favor. Although there have been companies that have been siting IT spending slow downs as the reasons for poor performance, I'm not sure that I wouldn't believe in our sector. I believe that the commerce and the customer management sector is very healthy. Our customers seem to be spending more money than ever before in that sector and even if their budgets may be slowing in terms of growth, I believe more dollars proportionally are being spent on these areas. We do believe we are in a good position to continue to grow quickly and sell into that space.

Question: Concerning an increase in the cost of operations... ,

Singh: We plan to double head count this year. As of today we are over 1000 people... we expect to grow that by roughly 100%. Our targeted revenue growth is 100% as well... We are very cautious as to how we build out our infrastructure and we tend to move our budgets very very quickly as we understand what the market is doing. Our operating plans tend to be very flexible. Unlike a lot of companies, we actually change our operating budgets for the year every six weeks depending on how we see things going... If we looked at our original budgets for last year we were targeting a year somewhere between 80-120 million in revenue. Obviously we ended up at 160+ million on the year and that was managed by virtue of very rapid budget changes, as we see things go better. If things go worse, similarly, we have a lot of flexibility to cut back so we tend to watch that very closely.

Question: You have more than a dozen analysts following your stock What do you think they miss the most about Art Technology Group.

Singh: They tend to categorize companies into buckets so to speak. In other words, we are assumed to be in the same sector as BroadVision, Vignette, BEA and IBM. In truth the companies actually are very different from each other in what they offer and sell. It tends to be difficult for analysts to make too fine distinctions because their own customers, investors they

are selling to, are looking for a more easily consumable message. I think that is particularly true today where sometimes you are seeing a divergence in the prospects or the execution within these companies and that investors are saying wait a minute, these companies aren't exactly the same. Why are some doing better than others. I think that is one of the areas of where we are least understood as to the difference in how we operate, how we sell, the specific products we sell and how we win our customers.

25. The representations by Singh had their desired effect with ART's stock price shooting up 38% in one day. The momentum created by these representations caused the stock price to artificially rise from $25.00 to over $40.00 in three days: Thursday, January 25, 2001 - $25.00; Friday, January 26, 2001 - $34.50; Monday, January 29, 2001 - $40.25.

26. These statements were false and misleading at the time they were made because Defendants knew or recklessly disregarded the facts that: (a) part of ATG's prior growth was based upon sales to dot-com companies, and the dot-com bubble had burst, causing both a decrease in sales to potential new dot-com customers, and a decrease in sales from upgrades and licence revenue from old dot-com customers; (b) the downturn in information technology ("IT") spending that was widespread. Defendants were informed through their partners, such as Sun Microsystems, IBM, and Hewlett- Packard, that hardware sales had slowed and therefore, naturally software sales would experience a correlative downturn; (c) although ATG's Dynamo 5 product was touted as being Java 2 Enterprise Edition ("J2EE") compliant and certified, one of the major J2EE features, transaction two phase commit, was faked in the implementation of Dynamo 5.1. Two phase commit refers to a transaction that can span two or more databases (which may be on different servers). This problem caused customers to put off upgrading to Dynamo 5.1. As a result of these facts, it would be impossible for ATG to achieve first quarter

2001 EPS and revenue of $0.10 and $70 million, respectively. ATG is currently touting Dynamo 5.5, designed to improve and correct problems in the 5.1 system.

27. After posting record results and experiencing the rapid appreciation of ATG's stock price, Singh was interviewed on January 30, 2001, by CNBC's Squawk Box. Singh stated that, "90 percent of our customer base are very large, established firms." He further stated that, "[i]t's pretty clear that the large companies are starting to realize that it's not only new business, it's cost savings, it's efficiency. They have a lot of money to spend. They have a lot to gain by doing this. So in terms of revenue numbers, clearly for us, you know, the sweet spot are firms that can buy not only our software once, but keep buying it, start deploying it across the world, not only build commerce applications, but start doing market exchanges and other things as well."

28. Defendants continued to give the false impression that the Company was immune from the IT slowdown that had ben affecting every other IT company. On January 30, 2001, The Boston Globe printed an article entitled, "Amid Net Wreckage, 2 Firms Show How to Climb." The article noted that Art Technology Group Inc. reported a fourth-quarter performance that "blew past" consensus forecasts, rose sharply from "battered lows" and "soared 61 percent in the last two trading days." The article asked, "[w]hat's the secret for maintaining a steep growth pattern while the rest of the economy already has slammed on the brakes?" The question was answered by Singh who said "[t]here are big dollars being spent by big global enterprise customers. It's a market very much dominated by big companies that don't only spend money once, but come back for more if things work out and they have a good experience." Indeed, a

very nice tale in a bear market.

29. On January 30, 2001, Defendant Singh was interviewed by CNBC/Dow Jones Business Video regarding ART's recent earning announcement and subsequent 60% increase in stock price. In addition to touting ART's products and competitive position, Mr. Singh specifically assured the market that the Company was not materially exposed to economically fragile "dot com" companies.

> Question: Mr. Singh, about 20% of your third quarter numbers came from "dot coms." How does the fourth quarter look?
>
> Singh: About 10%. That number has been declining sequentially each quarter. Now we believe our exposure to that sector is pretty much at its bottom... So very little exposure there. We don't take much risk with those companies. But we... take most of cash up front from those firms. So 90% of our customer base are very large, established firms.

30. In mid-February, at a Goldman Sachs sponsored conference, Defendants once again reassured investors and analysts that their business was strong and that they remained upbeat with respect to the quarter.

31. On February 23, 2001, Dain Rauscher Wessel's analyst S. H. Sigmond issued a report stating that according to the Company's management, "ATG's pipeline of new and repeat business appears very healthy." Based upon such representations, Sigmond concluded that earnings would be up 50%.

32. On March 8, 2001, based on a meeting with ATG management, Needham & Co. analyst Richard Davis stated that the Company was the "best bet in the e-customer relationship management sector." Davis' assessment was bolstered by the Company's assertion that business for the quarter remained on track.

33. Each of the statements made by Defendants between January 25, 2001and April 2, 2001 were false or misleading in light of the following facts then known to Defendants:

a. The Company's latest edition of their flagship product, Dynamo 5.1, which had been first shipped to ATG's customers in third quarter 2000, was not 100% J2EE compatible as advertised resulting in ATG's customers' wide-spread refusal to upgrade;

b. ATG's licence revenue growth would not achieve the 50% growth stated by Defendants due to the inability of ATG's customer base to pay for the product;

**The Truth Emerges**

34. Contrary to their prior representations, on April 2, 2001, ATG shocked the market by announcing that it would post an EPS loss of over $.22 per share. This disclosure caused ATG's stock to decline 50% to less than $5.40 per share before closing at $5.96 on record volume of more than 24 million shares, inflicting millions of dollars of damage on plaintiff and the Class.

35. As reported in an April 2, 2001 article on *Forbes.com* entitled: Dog Of The Day: Art Technology Group:

Art Technology Group stunned Wall Street today by pre-announcing a first-quarter loss instead of the expected profit. The stock plummeted 50%, earning it the title of *Forbes.com Dog Of The Day*.

'The size of the miss was significantly greater than I anticipated,' says analyst Paul Krieg, who follows ATG for Legg Mason. To Krieg, the company's revenue shortfall is at least as disturbing as the earnings miss. Krieg had forecast first-quarter revenue of $72 million for ATG, but today the company projected revenues of only $40 million to $42 million. 'Toward the end of the first quarter, we saw large enterprise customers across many vertical industries delay technology purchases due to the current economic environment,' company Chief Executive Jeet Singh said in a statement. 'As a result, multiple large deals that we had expected to finalize very late in the first quarter were not closed.'

* * *

The company said it has postponed expansion plans and suspended hiring except for sales. The current guidance for 2001 was declared obsolete, and no new guidance will be offered until ATG has revised its operating plan. Nothing like a huge earnings miss and a complete lack of visibility to send a stock crashing to the floor.

There is no concrete information on any large deals with ATG that fell through. ATG did, however, make a provision in their March 2001 10K and their July 2001 10Q for the fact that their stock price may fluctuate depending on several factors, one of which was ATG's failure to complete significant sales.

36. In an feeble attempt to explain the huge revenue shortfall, Defendants claimed that large customers had cut their technology budgets and the company was not able to close many of its deals. As reported by *TheSubway.com* via the *Business Wire* on April 3, 2001, "[t]oward the end of the first quarter, we saw large enterprise customers across many vertical industries delay technology purchases due to the current economic environment," stated Jeet Singh. "As a result, multiple large deals that we had expected to finalize very late in the first quarter were not closed. In response to our lower-than-anticipated top and bottom lines and a lack of market visibility, we are looking closely at every possible means of reducing our operating expenses." Contrary to their January representation to double the number of employees, Singh stated that they have "suspended hiring in all departments." In fact, a little over a week later, ATG announced that it would "slash 12% of its workforce, or 150 people and cut the pay of remaining employees.

37. On April 26, 2001, as reported by *TheStreet.com*, ATG, beat its sharply lowered earnings expectations by two cents, losing only 19 cents per share on revenue of $42.8 million.

38. The next day ART announced that its CFO, Ann Brady, had resigned and the Company was cutting salaries and consolidating offices.

## ADDITIONAL SCIENTER ALLEGATIONS

39. Each misrepresentation and/or omission of material fact alleged herein was made with reckless disregard for, or knowledge of its false and misleading nature. At all relevant times, each Defendant was in a position to know, and did in fact know the material facts regarding the true state of ATG's business.

40. Each Defendant had the opportunity to commit and participate in the fraud described herein. The Individual Defendants were each top officers, directors and/or shareholders of ATG and thus controlled the Company's press releases, corporate reports, SEC filings and communications with analysts. Thus, they controlled the public dissemination of and could falsify and/or omit, the material information about ATG's accounts, that reached the public and affected the price of ATG's shares.

41. Indeed, ATG's partner-enabled revenue was 85 percent for the quarter. Using such partners gave ATG high pipeline visibility. Furthermore ATG partnered with Sun Microsystems, Hewlett-Packard and IBM on the hardware side. Each of these companies had already warned that they were negatively impacted by the IT downturn and that as a result earnings would suffer. ATG and Sun had a close working relationship which resulted in more than 650 mutual customers (of ATG's 670 customers). Just as Sun knew by early February that it had become another victim of the IT slowdown, so too did ATG.

42. Each of the Defendants had the motive to commit and participate in the scheme. The combination of attributable knowledge with the evident profit incentives for the various Defendants creates a strong inference of scienter.

43. Further, defendant Singh sold the following amounts of his ATG stock despite his possession of adverse information about ATG's business which he knew had not been disclosed to the public:

**Singh's Class Period Sales**

| | | |
|---|---|---|
| 3/13/01 | Sold 10,000 at $18.53 | netting $ 185,300 |
| 3/12/01 | Sold 10,000 at $16.32 | netting $ 163,200 |
| 3/6/01 | Sold 10,000 at $25.55 | netting $ 255,500 |
| 3/5/01 | Sold 10,000 at $22.55 | netting $ 225,500 |
| 2/27/01 | Sold 10,000 at $29.09 | netting $ 290,900 |
| 2/26/01 | Sold 10,000 at $28.63 | netting $ 286,300 |
| 2/21/01 | Sold 10,000 at $30.69 | netting $ 306,900 |
| 2/20/01 | Sold 10,000 at $35.13 | netting $ 351,300 |
| 2/13/01 | Sold 10,000 at $39.38 | netting $ 393,800 |
| 2/12/01 | Sold 10,000 at $36.58 | netting $ 365,800 |
| 2/8/01 | Sold 2,500 at $36.86 | netting $ 92,150 |
| 2/7/01 | Sold 17,500 at $37.19 | netting $ 650,825 |
| 1/30/01 | Sold 20,000 at $40.93 | netting $ 818,600 |
| **Total** | **Shares Sold 140,000** | **netting $4,386,075** |

44. In addition, Defendant Chung sold the following amounts of his ATG stock despite his possession of adverse information about ATG's business which he knew had not been disclosed to the public:

**Chung's Class Period Sales**

| | | |
|---|---|---|
| 3/13/01 | Sold 10,000 at $18.53 | netting $ 185,300 |
| 3/12/01 | Sold 10,000 at $16.32 | netting $ 163,200 |
| 3/6/01 | Sold 10,000 at $25.55 | netting $ 255,500 |
| 3/5/01 | Sold 10,000 at $22.55 | netting $ 225,500 |
| 2/27/01 | Sold 10,000 at $29.09 | netting $ 290,900 |
| 2/26/01 | Sold 10,000 at $28.63 | netting $ 286,300 |
| 2/21/01 | Sold 10,000 at $30.69 | netting $ 306,900 |
| 2/20/01 | Sold 10,000 at $35.13 | netting $ 351,300 |
| 2/13/01 | Sold 10,000 at $39.38 | netting $ 393,800 |
| 2/12/01 | Sold 10,000 at $36.58 | netting $ 365,800 |

| | | |
|---|---|---|
| 2/8/01 | Sold 2,500 at $36.86 | netting $ 92,150 |
| 2/7/01 | Sold 17,500 at $37.19 | netting $ 650,825 |
| 1/30/01 | Sold 20,000 at $40.93 | netting $ 818,600 |
| **Total** | **Shares Sold 140,000** | **netting $4,386,075** |

45. Both Singh and Chung's insider sales during the Class Period were highly suspicious given their proximity to the date of the bad news and the fact that they occurred before the stock had dropped and while Singh and Company were making positive statements.

46. Singh and Chung watched ATG's sales, closely monitoring the performance of ATG's operations. As a result of this monitoring, Singh and Chung were aware that ATG would be unable to meet its projection results, as its software business was slowing and its customers were unable to continue the capital expenditure programs at the levels previously conveyed to Defendants in light of the dramatic adverse developments of 2000.

47. In addition to having actual knowledge of the falsity of their statements, Defendants had the motive and the opportunity to perpetrate the fraudulent scheme and course of business described herein, in order to each sell over $4.3 million worth of ATG shares at prices as high as $40 per share, or 80% higher than the price to which ATG shares dropped at the end of the Class Period, as ATG's true prospects began to reach the market.

## FAILURE TO INVOKE THE STATUTORY SAFE-HARBOR

48. The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the false forward-looking statements pled in this Complaint. None of the forward-looking statements pled herein were sufficiently identified as a "forward-looking

statement" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from that in the forward-looking statements accompany those statements. To the extent that the statutory safe harbor does apply to any forward-looking statements pled, the Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of ATG who actually knew that those statements were false when made.

## COUNT I

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated thereunder against all Defendants

49. Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

50. During the Class Period, Defendants engaged in a plan, scheme and course of conduct which: (i) deceived the investing public, including Plaintiff and other Class members; (ii) artificially inflated and maintained the market price of ATG common stock; and (iii) caused Plaintiff and other Class members to purchase ATG stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

51. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of ATG shares would be based on truthful, complete

and accurate information.

52. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business operations of ATG as stated herein, and engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of ATG shares during the Class Period.

53. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.

54. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts that market price of ATG shares were artificially inflated during the Class Period. In ignorance of the facts that the market price of ATG shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to ro recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other Class members acquired ATG shares at artificially inflated prices and were damaged thereby.

55. At the time of the misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsehood, and believed them to be true. Had Plaintiff and the other Class members known that the price of ATG shares had been artificially inflated by Defendant's fraudulent scheme, Plaintiff and other Class members would not have purchased or otherwise acquired their ATG shares, or, if they had acquired such shares, they would not have paid artificially inflated prices.

56. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule

10(b)-5 promulgated thereunder.

57. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of ATG shares during the Class Period.

## COUNT II

### For Violations of Sections 20 of the Securities Exchange Act of 1934 Against The Individual Defendants

58. Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein. This Count is asserted against Defendants Singh and Chung.

59. Because of their positions of control with respect to the Offering and their knowledge of ATG's business operations, Defendants Singh and Chung are controlling persons within the meaning of Section 20 of the Securities Exchange Act of 1934.

60. By virtue of the foregoing, Plaintiff and the other Class members are entitled to damages against Singh and Chung, jointly and severally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own and on behalf of the Class, pray for judgment as follows:

1. Declaring this action to be a class action pursuant to Rules 23(a) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2. Awarding Plaintiff and members of the Class rescissory or compensatory damages in an amount which may be proven at trial, together with interest thereon;

3. Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees and expert witness fees and other costs; and

4. Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach,

impound or otherwise restrict the Defendants' assets to assure Plaintiff and the members of the Class have an effective remedy.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

October 30, 2001

By: Thomas V. Urmy, Jr.
SHAPIRO, HABER & URMY
75 State Street
Boston, Massachusetts 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Burton Finkelstein, Esq.
Andrew Morganti, Esq.
Conor Crowley, Esq.
FINKELSTEIN, THOMPSON,
& LOUGHRAN, LLP
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

# PLAINTIFF CERTIFICATION

I, George Murphy hereby declare that:

1. I have reviewed the Complaint in this class action and have authorized the filing thereof.

2. I did not purchase (or otherwise acquire) or sell securities of Art Technology, the subject of this class action, at the direction of my counsel or in hope to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

3. I am willing to serve as a representative plaintiff on behalf of the class defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4. I have engaged in the following transactions involving securities of Art Technology:

| Purchase Date | Number of Shares | Price Per Share |
|---|---|---|
| 1/31/01 | 50 | 39 15/16 |

| Date Sold | Number of Shares | Price Per Share |
|---|---|---|
| 2/2/01 | 50 | 36 3/8 |

5. During the last three years preceding the date of this Certification, I have sought to serve as a lead representative plaintiff on behalf of a class in the following actions brought under the Securities Act of 1933 or the Securities Exchange Act of 1934:

6. I will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, except as ordered by the Court.

7. Nothing herein shall be construed as a waiver of my attorney-client privilege.

I declare under penalty of law that the foregoing is true and correct.

Executed on the 15 day of October, 2001.

George Murphy

~~Robert~~ Murphy
George